**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 CR 287-3 |
| | ) | Judge Martha M. Pacold |
| JEFFREY BUDZIK, | ) | |
| Defendant. | ) | |

**DEFENDANT JEFFREY BUDZIK'S SENTENCING MEMORANDUM**

The defendant, Jeffrey Budzik, through his attorney, Renee Woodward, respectfully requests that this Court sentence Mr. Budzik to one-day time served with no supervised release to follow, the sentence recommended in his Presentence Investigation Report (PSR). In support of this request, Mr. Budzik submits the following:

## I. INTRODUCTION

The criminal conduct that led to the charges in this case occurred over fourteen years ago. Since that time, Mr. Budzik has become a successful member of his community, a loving father to two children, and married his spouse, Marcela Budzik, in 2018. As the United States Probation Office stated:

> [T]here appears no reason to disrupt the defendant's life by sending him to prison, as he has now been separated from his illegal conduct by 14 years. The defendant's presence in society will be more beneficial by him remaining in the community, where he can continue to positively contribute to his family and continue to repay restitution as penance for his crime.

> From page 2 of the PSR Sentencing Recommendation.

## II. BACKGROUND

It is important to understand what led to this case, and who Mr. Budzik is today. At the time of the criminal conduct, Mr. Budzik and co-defendant, Robert Lattas, had been friends for over twelve years. In 2008, Mr. Lattas asked Mr. Budzik to represent buyers in a South Loop

condominium development.  At that point, Mr. Budzik had only been a practicing lawyer for two years, while Mr. Lattas was already established in the local legal community.  Mr. Budzik saw this as a chance to expand his book of business, and to hopefully get more referrals from Mr. Lattas, and as such, accepted the offer.  It was through Mr. Lattas that Mr. Budzik met co-defendant Asif Aslam, who asked Mr. Budzik to also handle transactions involving a different development on the Northside.  Mr. Budzik ended his involvement with the real estate closings at issue in this case in approximately December 2008 / January 2009.[1]  Shortly thereafter, Mr. Budzik refocused his legal practice away from real estate and toward a collections practice. This information is not offered to minimize his acceptance of responsibility but to explain how this case came about.

The decision to work with Mr. Lattas and Mr. Aslam was the worst of his career, and likely the worst decision in his life.   Mr. Budzik saw it as a way to help get his business off the ground, and he naively went in without considering the legalities of what he was asked to do. The decision was a mistake.  He regrets his decision to this day, he knows his actions hurt others, and the consequences of the decision have loomed over him continuously through the years and even today.

Since he was first contacted by the government Mr. Budzik has worked to atone for his actions. Discussed in more detail below and in the PSR, Mr. Budzik has paid over $100,000 in restitution voluntarily, cooperated extensively with the government and testified against Mr. Lattas in another case.

---

[1] Mr. Budzik made less than $12,000 from the closings – substantially less than most if not all his co-defendants made in this case.  Prior to being contacted by the government, Mr. Budzik donated all the money he received from the closings to charity.

Now Mr. Budzik is successful in both his personal and work life. He is happily married to the love of his life, Marcela Budzik, and their son, just celebrated his first birthday. He is also a loving father to his daughter. But he fears what will happen if he receives a sentence of incarceration. These fears have weighed over him in one form or another for the last ten years. Mr. Budzik will almost certainly lose custody of his daughter (leaving her without her father and separated from her brother), his wife will likely need to move to Colombia (where she is from and where her family lives) with their son, and he will lose his job and his ability to support his family.

## III. GUIDELINES AND PROPOSED SENTENCE

The guidelines in Mr. Budzik's plea are 63 to 78 months, with a possible government recommendation under §5K1.1 of not more than 60 percent of the low end of the applicable guideline range (37.8 months). In addition, the plea agreement provides that Mr. Budzik can request any sentence. Accordingly, and as set forth in greater detail below, Mr. Budzik is eligible for a sentence of one day incarceration, time considered served. That is the sentence that Mr. Budzik is requesting from this Court.

The United States Probation Office also recommends Mr. Budzik receive a sentence of one day time served with supervised release not recommended. As stated in the PSR:

> *The defendant has been on bond since June 6, 2014. This not only demonstrates that he is able to live a law-abiding life for a lengthy period of time but also that prosecution of this case has been part of his life for at least eight years. As reflected in the defendant's version, he has gone through numerous life changing events since that time. Although it is the defendant's own fault that he is involved in the criminal justice system and this case at all, he is still pending sentencing due to his cooperation agreement. That is, the defendant cooperated with the government by participating in proffer interviews, testifying before the grand jury, and testifying at an unrelated trial. Accordingly, this officer concurs with the*

3

> *government that a downward departure is appropriate in this case. The defendant's codefendant, Asif A. Aslam, who was involved in the transactions with the defendant, had the same guideline range as the defendant, and also cooperated, and was sentenced to one day time served with no supervised release to follow. As such, the recommended sentence is appropriate to eliminate sentencing disparity between he and his codefendant with whom he mutually participated in the scheme.*

PSR, Sentencing Recommendation, page 2.

## IV. TIME SERVED IS SUFFICIENT UNDER §3553

The U.S. Sentencing Guidelines are merely advisory, and district courts have been given wide discretion in sentencing defendants under §3553. *Gall v. United States*, 128 S.Ct. 586, 596 (2007). §3553(a) instructs district courts to "impose a sentence sufficient, but not greater than necessary," to accomplish the purposes of sentencing. A guideline range is not presumed to be reasonable. As such, after calculating the sentencing guideline range, this Court should consider §3553 factors to consider whether the requested sentence is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. Factors to consider include:

- the history and characteristics of the defendant, §3553(a)(1);
- the need to provide restitution to the victims, §3553(a)(7);
- the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, §3553(a)(6); and
- the need to protect the public from further crimes of the defendant, §3553(a)(2).

In light of the §3553 factors and the expansive discretion given to this Court, a sentence of time served is appropriate for Mr. Budzik.

4

## A. HISTORY AND CHARACTERISTICS

### 1. COOPERATION

Mr. Budzik's cooperation began almost immediately after he was first contacted by the government in the Spring of 2013. Mr. Budzik attended several proffers at his own expense, flying in from Florida, which then led to him testifying before the grand jury in December 2013. He was then the first defendant to plead guilty in this case.

It was during one of his proffers that Mr. Budzik mentioned information regarding Mr. Lattas' involvement in another case (13 CR 463). Mr. Budzik had absolutely no involvement in that case, but Mr. Lattas liked to talk and often told Mr. Budzik about business deals. The information provided by Mr. Budzik proved to be useful enough that he testified against Mr. Lattas in 13 CR 463 for the government in September 2015. From the Government's Response to Defendant's Lattas' Motion for Judgment of Acquittal or Alternatively For A New Trial, the government went into detail about the usefulness of Mr. Budzik's testimony (attached as Exhibit A):

> *Jeffrey Budzik was a government witness at trial. Budzik testified that defendant told him about the above fraudulent structure for real estate transactions. Defendant told Budzik that using LLCs to act as the seller in transactions as described above allowed for the loan proceeds to be disbursed without lenders knowing. Defendant also said that, using this structure, other people could provide the buyer's down payment and the LLC could pay them back. Defendant confirmed to Budzik that the LLCs were used to hide payments from lenders, including payments to the individuals who provided the down payment.* Exhibit A, page 4.

> *Finally, the government presented testimony from Gawlik, Budzik, and Young, which further established defendant's knowing involvement in the fraud. While defendant claims that Gawlik and Budzik did not tell the truth, that was for the jury to decide. Clearly, the jury believed the testimony from Gawlik, Budzik, and Young, and did not believe defendant. Exhibit A, page 8.*

The government asserted that Mr. Budzik's testimony was consistent, showed that Mr. Lattas structured transactions to hide money paid to others, established Mr. Lattas' "knowing involvement in the fraud", and found that the jury believed Mr. Budzik and not Mr. Lattas.

In part because of Mr. Budzik's testimony, Mr. Lattas was found guilty in 13 CR 463, and subsequently Mr. Lattas pled guilty in this case. Further, it should be noted that Mr. Budzik plead guilty early in this case in order to testify at such trial, accelerating the ramifications discussed below.

## 2. PERSONAL LIFE

The months leading up to that guilty plea and testimony in September 2015 were extremely difficult for Mr. Budzik. In June 2015, Mr. Budzik was diagnosed with testicular cancer, requiring immediate surgery and the removal of a testicle, which was followed by a course of chemotherapy beginning in August. Added to this, Mr. Budzik's then wife was deeply troubled about the plea and did not want him to go through with it. She thought his criminal conviction would be embarrassing and ruin their life, plus put them in financial despair. Mr. Budzik's wife did not attend his post-operation doctor visit, and did not provide him with any support, emotional or otherwise, at a time when he greatly needed her.

Despite such difficulties, Mr. Budzik did not waiver from his commitment to the government, continuing to provide assistance during such time and ultimately testifying against Mr. Lattas on or about September 30, 2015. In order to testify, Mr. Budzik flew into Chicago in late September and flew back home to Florida on October 1. While Mr. Budzik was in Chicago to testify and plead guilty, his wife filed divorce proceedings against him. Within the following weeks, his wife relocated their daughter, to her parents' home in Arizona without warning or consulting Mr. Budzik, in violation of Florida law. This began a lengthy custody battle for their

daughter, who was only 2 years old at the time.  Just months after the initial custody issues were resolved, Mr. Budzik's former wife remarried and relocated to Texas, causing further litigation regarding  his daughter's residence.  The attached letter from Mr. Budzik's attorney, Donald Criscuolo, outlines the situation and how Mr. Budzik has been able to maintain fifty percent custody / time-sharing of his daughter.[2] (Attached as Exhibit B).

Adding to this, Mr. Budzik lost his job when he pled guilty.  In discussions with his firm's CEO, Ernesto Perez, prior to the plea, Mr. Budzik was told that he would either have to resign prior to pleading guilty or be fired after.  Luckily, Ernesto, along with other partners, fought hard to keep Mr. Budzik, including traveling to New York and working out an arrangement with the firm's in-house counsel to bring him back on as an independent contractor. Still, Mr. Budzik lost insurance and other benefits, along with bonuses.

Mr. Budzik continued to work as a contractor for his old firm until the Summer of 2022, when he resigned to pursue another opportunity.  He now works at a different tax consulting firm, where he was able to obtain a partnership interest.  As evidence of the kind of person Mr. Budzik is now – attached are numerous letters from Ernesto, other former supervisors and colleagues, and Jeff's sister. (Attached as Exhibit C).

As detailed in such letters, Mr. Budzik was held in the highest regard in his role as a tax consultant, which enabled their continued support.  However, Mr. Budzik was also well aware that due to the sensitive nature of his situation, to maintain such support, he would have to be an exceptional employee, which often meant working substantial hours and continuously going

---

[2] It should be noted that throughout this time, Mr. Budzik has made, and continues to make, his daughter and her upbringing an utmost priority in his life.  This is reflected in several character letters which have been provided on his behalf. As of now, during the school year, Mr. Budzik's ex-wife is required to maintain a home in Miami, Florida, to execute her portion of timesharing with his daughter therefrom; however, at substantially all other times, she executes her timesharing from Texas.

above and beyond.  The last ten years have been hard on Mr. Budzik, he has pushed himself and suffered from worry, fear, and anxiety. He has striven to do everything that he can do for his family and atone for his mistakes.

No matter how busy with work Mr. Budzik may be, he consistently makes spending time with his family a priority (whether that be taking his daughter to school events / extracurricular activities, fostering daily bike rides or other family activities and weekend excursions, or simply cooking and having dinner together), even if that would mean resuming work after his children's bedtime, working well into the late hours of the night.  Moreover, Jeff centers his family in faith, attending church weekly,[3] and bringing the principles discussed therein to their everyday lives.

Mr. Budzik is the primary wage earner for his family and is also the foundation for Marcela's current employment.  Marcela left her previous job upon the birth of their son, as she was unable to come to a viable arrangement with her then boss, considering the stress of her engineering position, coupled with her condition and new responsibilities.  To attain the necessary flexibility and limitation on hours worked, Marcela partnered with Mr. Budzik in his new business venture. If Mr. Budzik is sentenced to a term of imprisonment, Marcela will likely also lose her job as it is tied to his.  Furthermore, as neither Mr. Budzik nor Marcela has any family in Florida, this would leave an unemployed Marcela, in the midst of a triggering event, alone to care for their infant son.[4]  Accordingly, as she states in her letter and as further supported by the attached letter from one of her physicians, Marcela needs Mr. Budzik. (Attached as Exhibit D). Without him, she will likely have to move back to Colombia with their son.

---

[3] Mr. Budzik has donated time and resources to his church over the last 5 years.

[4] See Exhibit D – Mrs. Budzik's letter and her physician's letter which details her need for Mr. Budzik's support.

If Mr. Budzik goes to prison, he will have to start his life over again for a second time from the same set of circumstances when he gets out, just as he did in 2015. Following any term of imprisonment, his job will be gone, his wife and son will be in Colombia, and he will have to begin another custody battle for his daughter, in Texas, as her mother has proclaimed in open court that if Mr. Budzik were incarcerated, she would move their daughter to Texas. Accordingly, the ramifications of any incarceration would extend far beyond the time period in and of itself.

### 3. HEALTH

Mr. Budzik also has a number of health issues, which precipitate a heightened vulnerability to COVID.[5] In addition to his cancer history, Mr. Budzik is overweight (he is treated for high blood pressure, high cholesterol), suffers from severe obstructive sleep apnea (where he stops breathing approximately 60 times per hour per the sleep study conducted by UHealth), for which he is required to sleep with a breathing machine (CPAP). People in prison face a higher risk of exposure to COVID-19, and the fear of testing positive with Mr. Budzik's pre-existing conditions is great.

### B. RESTITUTION

Under §3553(a)(7), the Court should consider the need to provide restitution. Mr. Budzik has been making voluntarily restitution since 2015 when he sought and received a court order allowing him to do so. No other defendant made restitution prior to sentencing. Thus far, Mr. Budzik has paid $103,500, including a payment of $13,000 in October 2022 and a payment of $50,000 in February 2023.

---

[5] See Underlying Medical Conditions Associated with Higher Risk for Severe Covid-19 - https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html

These payments were entirely voluntarily and occurred almost every month since 2015. Even in times of great financial pressure, which included a prolonged and expensive legal battle over his daughter, and a change in employment circumstances, Mr. Budzik made payments.

The restitution owed here is substantial – close to ten-million dollars. If Mr. Budzik receives a sentence of incarceration, he will surely lose his job, and the chance to make substantial payments toward the restitution.

### C. CO-DEFENDANTS

Under §3553(a)(6), this Court should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Comparing Mr. Budzik with his co-defendants, a sentence of time in prison would result in a disparity.

Below is a breakdown of Mr. Budzik's co-defendant's sentences, what the government recommended, and the actual sentence.

| **Defendant** | **Sentence** | **Government Recommendation** | **Actual Sentence** |
|---|---|---|---|
| Warren Barr | 87 months | 151-188 months or 108-135 months if accepts responsibility | 4/30/2019 – Surrender Date<br>He is currently in a halfway house |
| Robert Lattas | Initial: 63 months to run concurrently with 84 month sentence in 13 CR 463.<br>Later: Sentence in 13 CR 463 reduced on 4/7/2020 to 63 months | 63 months to run concurrently | 12/3/2018: Surrender Date<br>4/3/2021: Placed on home confinement<br>5/20/2022: Released from custody of BOP (according to the BOP webpage)[6]<br>Served – approx. 2 years, 4 months in prison, and approx. 1 year, 2 months of home confinement |
| Asif Aslam | Time Served | 42 months | Time Served Without Supervised Release |
| Leonardo Sanders | 28 months | 33 – 41 months | 4/20/2018-Surrender Date<br>4/14/2020-Released |
| James Carrol | 41 months | 42 months | Currently out of custody pending possible appeal |

This case is unusual in many ways with regards to Mr. Budzik and his co-defendants: issues with many rescheduled sentencing dates, years from plea to sentencing, the Pandemic, and early releases from prison. For instance, Mr. Lattas, with more involvement and culpability in this case, was sentenced to 63 months in this case to run concurrently with the 84 month sentence in 13 CR 463, yet spent only 28 months in prison with the BOP. This time is well below the guideline range that is outlined in Mr. Budzik's plea agreement.

---

[6] Counsel does have access to all the information regarding the amount of time the defendants served in the BOP. It appears from Mr. Lattas' Unopposed Motion to Modify Conditions of Supervised Release to Permit International Travel, Docket #411 in 13 SC 463, that Mr. Lattas was released from prison on April 3, 2021. Attached as Exhibit E. If he surrendered to the BOP on December 3, 2018, he served approximately 2 years and 4 months in prison. It similarly appears that co-defendant, Warren Barr, was also released early.

Given Mr. Budzik's acceptance of responsibility, his substantial cooperation and testimony, and his restitution payments – a sentence of time-served would be appropriate, and eliminate any sentencing disparity.  Again, as stated in the PSR:

> *The defendant's codefendant, Asif A. Aslam, who was involved in the transactions with the defendant, had the same guideline range as the defendant, and also cooperated, and was sentenced to one day time served with no supervised release to follow. As such, the recommended sentence is appropriate to eliminate sentencing disparity between he and his codefendant with whom he mutually participated in the scheme.*

PSR, Sentencing Recommendation, page 2.

### D.  NO RISK TO REOFFEND

Under §3553(a)(2), the need to protect the public from further crimes of Mr. Budzik is not an issue in this case.  As the passage of time has shown, Mr. Budzik's involvement in this case is an anomaly, and his actions over the last ten years are offered as proof.

Mr. Budzik understands that his actions were wrong, and shall never do anything that could cause further harm to himself or his family. His role with his family is too great for him to ever jeopardize his freedom or family again, and his plea in this case shows that he truly understands what he did was wrong.

## V. CONCLUSION

For the foregoing reasons, Mr. Budzik requests a sentence of time served. Such a sentence would serve the interests of the public while still taking into account other sentencing considerations under §3553.

Respectfully submitted,

/s/ Renee Woodward
Attorney for Jeffrey Budzik

Renee Woodward
Woodward Law Office LLC
4256 N. Ravenswood, Suite 106
Chicago, Illinois 60613
(773) 242-9290
renee@woodwardlegal.com

## CERTIFICATE OF SERVICE

I, Renee Woodward, hereby certify that February 10, 2023, I caused a copy of the foregoing document to be served upon all counsel of record for all parties that have appeared via the Court's CM/ECF System.

/s/ Renee Woodward Renee Woodward

Renee Woodward
Woodward Law Office LLC
4256 N. Ravenswood, Suite 106
Chicago, IL 60613
(773) 242-9290
renee@woodwardlegal.com

14