EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 13 CR 463-2 |
| | ) | Judge John W. Darrah |
| ROBERT LATTAS | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT LATTAS' MOTION
FOR JUDGMENT OF ACQUITTAL OR ALTERNATIVELY FOR NEW TRIAL**

The UNITED STATES OF AMERICA, by its attorney, ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, hereby provides its response to defendant Robert Lattas' Motion for Judgment of Acquittal or Alternatively For New Trial. [Docket #184.] After a nine day trial in this case, a jury convicted defendant of four counts of wire fraud (Counts 1, 3-5) and one count of mail fraud (Count 2). The evidence at trial established that defendant participated in a mortgage fraud scheme along with co-defendants Steven Bartlett and Nicholas Burge. Thus, for the reasons set forth below, defendant's motion should be denied.

## I.   Factual Background

At trial, the government presented substantial evidence showing defendant's involvement in a mortgage fraud scheme along with his co-defendants. The scheme worked in the following fashion. Bartlett owned and was looking to sell properties on Chicago's south side, usually in the Englewood neighborhood, so that he could obtain money. To sell these properties, Bartlett worked with and agreed to pay recruiters who located buyers and convinced them to buy Bartlett's properties. The evidence at trial focused on five properties in Chicago located at 5734 S. Loomis, 6243 S. Racine, 5527 S. Marshfield, 6433 S. Peoria, and 6723 S. May.

The individuals recruited to buy these properties could not legitimately qualify for mortgage loans. As a result, false and fraudulent information was submitted to mortgage lending institutions to qualify the buyers for mortgage loans. The false information submitted to obtain mortgage loans included false information about buyers' assets, source of down payment, income, employment, and intention to occupy the properties as a primary residence.

The mortgage loans at issue required the buyers to provide a down payment, and the amount of the down payment oftentimes reached as high as $75,000. The buyers were unable to fund such a high down payment using their own money. Thus, Bartlett recruited individuals to provide down payment funds for the buyers in a way to make it look like the buyers themselves were the source of the funds. Specifically, individuals who provided the buyers' down payments purchased cashier's checks listing the buyers as the remitter on the checks. This made it appear to the lenders and title companies that the buyers themselves were the source of the down payment checks brought to closings, when they were not. The individuals who provided the down payment checks had arrangements with Bartlett to be repaid the money they provided along with a profit after Bartlett received the proceeds from the sales.

Since the buyers were not the source of the down payments, numerous false documents were submitted to lenders in the transactions. These false documents included loan applications, which falsely stated the buyers were the source of their down payments, and HUD-1 settlement statements, which falsely stated the buyers were bringing their own money to closings. Defendant signed the HUD-1 settlement statements as power of attorney for Bartlett.

Defendant's role in the scheme was to serve as Bartlett's attorney in these fraudulent real estate transactions. The evidence at trial showed that defendant was aware of and helped facilitate the down payment fraud. Evidence at trial also showed that defendant structured

Bartlett's transactions so the lenders funding the mortgage loans would not know about money being paid to the individuals who provided the down payments and recruited the buyers.

The evidence establishing defendant's involvement in the fraud included, among other things: (1) documentary evidence showing that defendant incorporated limited liability companies to serve as the sellers in these transactions; (2) documentary evidence and witness testimony that defendant was responsible for wiring money to a down payment provider and recruiters; (3) testimony from Jeffrey Budzik; (4) testimony from Steven Gawlik; (5) phone records and an email; (6) testimony from a buyer named Brandon Young; and (7) defendant's testimony.

## A. Defendant's incorporation of limited liability companies to serve as the seller

The evidence at trial showed that defendant structured Bartlett's transactions to conceal from the lenders funding the mortgage loans that substantial amounts of the loan proceeds were not going to Bartlett, the seller, but instead were being used to: (1) repay and compensate the down payment middleman; and (2) pay recruiters who found the buyers. More specifically, the evidence at trial showed that, usually on the date of the closings, the properties at issue were deeded from Bartlett's company to a limited liability company defendant formed in the name of the street address of the property, *i.e.*, 5734 S. Loomis, LLC. These LLCs were also almost always formed on the closing date, and the members of the LLCs were usually Bartlett's company, the company associated with the down payment middleman, which was usually Steven Gawlik, and a company associated with the individual who recruited the buyer. Gawlik and the recruiters testified they had no knowledge their companies were being made a part of an LLC selling the property, and never agreed to that arrangement.

Evidence presented also showed that, again usually on the closing date, defendant opened

3

bank accounts for the LLCs at Community First Bank. Defendant was the only signatory on these accounts, and witness testimony established that the bank was required to obtain his approval for any wire transfer of funds out of these accounts. Documents admitted into evidence established that, at defendant's direction, the closing funds were wired into these LLC accounts, and defendant then disbursed the funds to the LLC's managers, specifically, Bartlett, Gawlik, and the recruiter.

The evidence at trial established that defendant implemented this fraudulent structure to conceal from the lenders funding the mortgage loans that large amounts of money were being used to repay the down payment provider and recruiters.

### B.  Jeffrey Budzik's Testimony

Jeffrey Budzik was a government witness at trial. Budzik testified that defendant told him about the above fraudulent structure for real estate transactions. Defendant told Budzik that using LLCs to act as the seller in transactions as described above allowed for the loan proceeds to be disbursed without lenders knowing. Defendant also said that, using this structure, other people could provide the buyer's down payment and the LLC could pay them back. Defendant confirmed to Budzik that the LLCs were used to hide payments from lenders, including payments to the individuals who provided the down payment.

### C.  Steven Gawlik's Testimony

Steven Gawlik was the individual who provided the buyers' down payments in four of the five transactions. Gawlik testified that he provided the down payments in a way to make it appear that the down payment funds were coming from the buyers themselves. Gawlik testified that he did this by purchasing cashier's checks for the down payments and listing the buyers as the remitter on the checks. Gawlik testified he agreed to engage in the scheme because, after the closings, Bartlett paid him the money he provided plus a profit on top.

Gawlik testified that after he purchased the down payment checks, he provided those checks to defendant at defendant's law office. Gawlik also testified that when he gave the checks to defendant, he often went over the check details with defendant to confirm that the checks contained accurate information, including the correct buyer's name and the correct check amount. In addition, Gawlik testified that he discussed with defendant the amount Gawlik was supposed to be paid after the transactions closed. This evidence showed defendant knew someone other than the buyers was providing the down payments.

### D. Phone records and email

Gawlik's testimony was corroborated, among other ways, by phone records and by an email introduced into evidence at trial. Summaries of phone records introduced into evidence showed contact between Gawlik and defendant near the closings, including contact between Gawlik's cell phone and defendant's cell phone. Additionally, in an email string Gawlik asked about money he was due after a transaction. In response, defendant tried to figure out where Gawlik's money was, in a way a reasonable jury could conclude showed that defendant knew exactly why Gawlik was receiving money after the closing.

### E. Brandon Young's Testimony

Further corroboration for Gawlik's testimony came from a buyer named Brandon Young. Young testified about a closing at defendant's law office where he saw an individual come into the building and enter an interior office. Young later identified a photograph of Gawlik as the individual he saw at the closing. This testimony corroborated Gawlik's testimony that he attended the closings and provided the down payment checks to defendant.

5

### F. Defendant's testimony

The jury also heard testimony from defendant, who took the witness stand in his own defense. Defendant's testimony was wholly incredible, as the jury found by virtue of its verdict. Throughout his testimony, defendant portrayed himself as someone who did what Bartlett told him to. That notion is ridiculous, as the evidence showed. Defendant denied knowing Gawlik, despite phone evidence defendant could not and did not explain away. Defendant also denied the conversation with Budzik, even though Budzik's testimony was consistent with evidence showing that defendant structured these transactions to hide money paid to down payment providers.

## II. Legal Standards

### A. Federal Rule of Criminal Procedure 29: Motion for Judgment of Acquittal

In deciding a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, a court does not re-weigh the evidence or judge credibility of witnesses. *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000). Rule 29 provides in pertinent part that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A defendant making a sufficiency of the evidence challenge "bears a heavy burden and faces a nearly insurmountable hurdle." *United States v. Seawood*, 172 F.3d 986, 988 (7th Cir. 1999). A jury verdict may be overturned only where the record contains no evidence, viewed in the light most favorable to the government, from which a rational trier of fact could find guilt beyond a reasonable doubt. *United States v. Vallar*, 635 F.3d 271, 286 (7th Cir. 2011); *United States v. Rea*, 621 F.3d 595, 601 (7th Cir. 2010).

## B. Federal Rule of Criminal Procedure 33: Motion for a New Trial

Pursuant to Rule 33, a court may grant a motion for a new trial "if the interests of justice so require." The "interests of justice" include situations in which trial error has jeopardized the substantial rights of the defendant. *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). The decision to grant a motion for a new trial is within the sound discretion of the trial court. *See United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989). As the Seventh Circuit explained in *Reed*, in exercising this discretion, "the court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable . . . . The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* (citation omitted). Moreover, "[m]otions for new trial based on weight of the evidence are not favored. Courts are to grant them sparingly and with caution, doing so only in those really 'exceptional cases.'" *Id.* However, unlike a motion for judgment of acquittal, a court "may properly consider the credibility of witnesses, and may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999).

## III. <u>Argument</u>

### A. Motion for Judgment of Acquittal

In his motion for judgment of acquittal, defendant argues that the government failed to prove he acted knowingly and intentionally in the charged scheme to defraud. Regarding Counts One through Four, defendant claims the evidence is based only on Gawlik. Regarding Count Five, defendant argues there was no evidence supporting his knowing and intentional involvement in the fraud.

In making his arguments, defendant ignores the substantial evidence summarized above implicating him in the fraudulent scheme. He also does not view the evidence in a light most favorable to the government, as is required at this stage of the case.

Starting with Counts One through Four, the government presented much more evidence than simply Gawlik, even though Gawlik's testimony would have been enough. *See United States v. Galbraith*, 200 F.3d 1006, 1012 (7th Cir. 2000). As summarized above, the government presented documentary evidence linking defendant to these transactions, including documents showing he incorporated LLCs used to facilitate the fraudulent scheme, deeded properties to those LLCs, and controlled the flow of fraud proceeds after the transactions closed. Indeed, it was defendant who arranged for the wire transfers used to pay back the individuals who provided the down payments and recruited the buyers.

The government also presented substantial evidence linking defendant to the fraud through phone records and the email noted above. Those documents further establish defendant's knowing participation in the fraudulent scheme.

Finally, the government presented testimony from Gawlik, Budzik, and Young, which further established defendant's knowing involvement in the fraud. While defendant claims that Gawlik and Budzik did not tell the truth, that was for the jury to decide. Clearly, the jury believed the testimony from Gawlik, Budzik, and Young, and did not believe defendant.

Defendant points to other witnesses from the trial, such as buyers or recruiters, to claim that their testimony conflicted with Gawlik's testimony. These witnesses' testimony, however, did not conflict with Gawlik or Budzik. By and large, these witnesses only testified that they did not recall meeting defendant at the closings. That does not mean defendant did not attend these closings, or that defendant did not receive the down payment checks from Gawlik.

8

Defendant presents a separate argument related to Count Five, which involved 6433 S. Peoria. For this transaction, defendant claims that because the down payment provider was not reimbursed through the LLC defendant formed, there was no evidence showing his knowledge of the fraud in this deal. However, by the time of this transaction, defendant knew of the fraudulent nature of Bartlett's transactions, including that buyers were not providing their own down payments. Budzik's testimony established that defendant assisted in facilitating the fraud through his creation of LLCs. Defendant created an LLC for this transaction to conceal payments from the lender. He made an entity called Lux Chateau a member of the LLC. Lux Chateau was owned by the recruiter. Evidence at trial established that Lux Chateau was made a member of the LLC without the owner's knowledge or consent. This supports Budzik's testimony that these LLCs were not a legitimate structure used for these transactions but instead were a way to conceal certain payments from lenders.

Finally, while defendant claims that the buyer in this transaction brought a $10,000 down payment, he ignores the additional $27,000 down payment check that came from an individual Bartlett recruited. The evidence at trial showed that defendant was aware of the fraudulent nature of Bartlett's real estate transactions, including that buyers were not bringing their own down payments. Defendant structured these transactions to hide the fraud, and he did that for the Peoria property as he did with other transactions. The evidence was sufficient to convict defendant on Count Five.

**B.    Motion For New Trial**

Defendant presents ten arguments for a new trial. Each argument is addressed below.

### 1. The arguments set forth above do not warrant a new trial

For all the reasons noted above, the arguments defendant submits in support of his motion for judgment of acquittal also do not support his motion for a new trial.

### 2. The Court did not err in admitting evidence regarding 5213 S. Morgan

Defendant claims the Court erred in allowing evidence about a property located at 5213 S. Morgan Street, Chicago, Illinois. The government introduced evidence about this property through Special Agent Andrea Warne. Special Agent Warne testified that defendant formed 5213 S. Morgan, LLC, on March 6, 2008, and made Bartlett's and Gawlik's companies members.

The controversy surrounding this property stems from defendant's cross examination of Gawlik. On direct examination, Gawlik testified he provided down payment funds for Bartlett's transactions on four or five occasions. He testified that the first transaction occurred in the winter or spring of 2008, and the closing took place at a title company, not at defendant's office. Gawlik was asked questions about this first transaction on direct examination, and defendant did not object. Later, the government showed Gawlik documents related to four transactions for which he provided the down payment funds. The first of these transactions was 5734 S. Loomis, which closed in July 2008 at defendant's law office. Thus, Gawlik was not referring to the Loomis transaction when he testified about the first closing in the winter or spring of 2008 that did not take place at defendant's office.[1] The government presented testimony about this first transaction as background for Gawlik's dealings with defendant and Bartlett.

When defendant cross examined Gawlik, he chose to make this first transaction a focal point, in an effort to paint Gawlik as mistaken or a liar. Defendant spent a significant amount of

---

[1] Gawlik's testimony was consistent with his statements made during interviews with the government, where Gawlik described a transaction in early 2008. Redacted copies of some of Gawlik's reports are attached as Exhibit A.

time trying to convince, or perhaps confuse, Gawlik that the Loomis transaction was the first transaction for which he provided down payment funds. Gawlik, however, remained firm that the first transaction took place in the spring of 2008, and was not at defendant's law office.

Defendant made this issue the center of his cross examination. As a result, after Gawlik's testimony, Special Agent Warne searched public records to determine if defendant, Bartlett, and Gawlik were involved in any transactions in early to mid-2008. After conducting this search, Special Agent Warne found Secretary of State records showing that on March 6, 2008, defendant created an LLC called 5213 S. Morgan, LLC. This evidence corroborated Gawlik's testimony that a transaction took place during this time frame because other evidence at trial from Budzik established that defendant created LLCs in Bartlett transactions as a way to conceal payments from mortgage lenders.

Defendant argues that the evidence about the Morgan transaction was improper propensity evidence under Federal Rule of Evidence 404(b). That is incorrect. The indictment in this case charges that defendant was part of a scheme to defraud—it is not limited to the five transactions that serve as executions of the scheme. The indictment alleges the scheme took place from in or about January 2008 and continued through until in or about January 2009. (Docket #1, ¶ 2.) The Morgan transaction took place in March 2008, within the time period alleged in the indictment. Defendant's actions in this transaction fall squarely in line with what the government alleged were his actions and role in the scheme.[2] Indeed, this is exactly why the

---

[2] *See* Docket #1, ¶ 15:

> It was further part of the scheme that defendant Robert Lattas structured SSB Re, Inc. real estate transactions by forming a limited liability company as the selling entity, and then disbursing the loan proceeds from the sale to a bank account in the name of that liability company in order to conceal from lenders that loan proceeds were being used to: (1) pay back individuals who provided funds for the buyers' down payments; and (2) pay individuals who recruited buyers to purchase properties.

government elicited testimony about this transaction on Gawlik's direct examination, and presumably why defendant did not object.

Moreover, even if this evidence were not part of the scheme, it was not admitted in violation of Rule 404(b)—which prohibits other acts to prove a person's character. This evidence was not admitted to show that defendant had a propensity to engage in fraud. Instead, the evidence was admitted because defendant opened the door to this issue. The evidence rehabilitated Gawlik and nullified the factual inaccuracies defendant tried to convey to the jury through his cross examination. Defendant had notice of Gawlik's testimony because he had Gawlik's reports which described the earlier transaction. He also heard Gawlik's testimony on direct examination and did not object. The government could not have given more specific notice because it did not know defendant would make this a significant issue at trial.

Simply put, it was defendant who opened the door to making the circumstances of the Morgan transaction a significant issue at trial. As this Court found, to allow defendant to cross examine Gawlik on grounds that he was lying about the Morgan transaction but not allow the government to present evidence establishing the truth would have been a miscarriage of justice.

Defendant also argues that the government violated Rule 16 when it failed to disclose evidence about the Morgan transaction. Defendant, however, ignores that the government was not in possession of information related to the Morgan transaction until after Gawlik's testimony. It was at that time the government searched **public records** to determine if another transaction took place in the time period related to Gawlik's testimony. When the government found such evidence, it promptly produced the **public records** to defendant. The government only searched for these materials because defendant made this transaction an issue in his cross examination. The government had no intention of making this transaction the focus of this case. The

government heard defendant's cross examination, and provided the jury with evidence showing exactly what happened. This allowed the jury to have a full picture of the truth.

Finally, defendant argues that admission of this evidence violated his Sixth Amendment right to confrontation. Defendant, however, fails to develop this argument. He ignores that he made this transaction an issue at trial. He also ignores that he was in a position to know which LLCs he formed for Bartlett and Gawlik. The fact that he focused Gawlik's cross-examination on this transaction was his decision.

### 3. Budzik's testimony was properly admitted

Defendant also argues that the Court erred in allowing Budzik's testimony. This issue was extensively litigated before trial, and the Court significantly restricted Budzik's testimony based on defendant's objection. Defendant covers no new ground in his post-trial motion. The Court's ruling was entirely correct and appropriately tailored Budzik's testimony to limit any prejudice or concerns under Rule 404(b). Accordingly, defendant's motion on this ground should be denied.

### 4. There was no improper pseudo-expert testimony

Defendant next objects to testimony provided by Russel Haraus. Defendant characterizes Haraus as a "pseudo-expert" whose testimony was irrelevant because Haraus did not have personal knowledge of the appraisals at issue in this case. He also claims that Haraus was not disclosed as an expert prior to trial.

Defendant is wrong about Haraus. Haraus **was** disclosed as an expert prior to trial. The government's disclosure letter is attached as Exhibit B. Defendant did not object to Haraus either on the basis of relevance or as to Haraus' qualifications. Moreover, Haraus' testimony was relevant because it showed the importance of disclosing seller concessions as part of an

appraisal. The evidence at trial established that money Bartlett paid for the buyers, including the down payment money, was not disclosed as part of the appraisal process. Accordingly, defendant's motion on this ground should be denied.

### 5. Failure to prove defendant guilty beyond a reasonable doubt

This argument should be rejected for all of the reasons stated above. The evidence was sufficient to convict defendant beyond a reasonable doubt on all counts.

### 6. There were no improper closing remarks

This argument should be summarily denied because defendant neither explains his theory nor develops this argument. Defendant fails to identify any improper closing remarks. Accordingly, there is no merit to this argument.

### 7. Jury instructions

Similar to the above, this argument should be summarily denied. Defendant does not identify issues regarding jury instructions that warrant a new trial.

### 8. Defendant's objections at trial

Defendant presents no argument on this ground, so it should be summarily denied.

### 9. Defendant's pre-trial motions *in limine*

Defendant presents no argument on this ground, so it should be summarily denied.

### 10. Cumulative error

Defendant's final argument alleges cumulative error. Defendant, however, has not established one trial error, much less cumulative error. A new trial would not serve the interests of justice. The evidence at trial established that defendant was a knowing member of the fraudulent scheme at issue. Defendant was given a fair trial at which his counsel vigorously

14

argued on his behalf. The jury considered the evidence presented at trial, and determined that defendant was guilty of the charges. That verdict should stand.

## IV.    <u>Conclusion</u>

For the reasons stated above, defendant's motion should be denied [#184].

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:  <u>/s/ Jason A. Yonan</u>
JASON A. YONAN
Assistant United States Attorney
219 S. Dearborn Street, Suite 500
Chicago, Illinois 60604
(312) 353-0708

Dated: January 8, 2016