UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 14 CR 287-3 |
| v. | ) | |
| | ) | Judge Martha M. Pacold |
| JEFFREY BUDZIK | ) | |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, Jr., United States Attorney for the Northern District of Illinois, hereby presents its sentencing memorandum for defendant Jeffrey Budzik. For the reasons set forth below, the government respectfully requests that the Court impose a sentence of imprisonment that is 60 percent of the low end of the advisory Sentencing Guidelines range of 63 to 78 months, or 37.8 months.

**I.      Introduction**

This case involved a "builder bailout" mortgage fraud scheme relating to a condominium development in the South Loop of Chicago, called Vision on State. During the recession of 2007-2009, when Vision on State's developers could not recoup enough money to pay off its financing, they developed a scheme that involved using straw buyers to complete fraudulent loan closings for numerous condominium units at above market prices, defrauding the mortgage lenders in the process.

Defendant Jeffrey Budzik was a licensed attorney at the time of the events in this case. Budzik served as the straw buyers' attorney for the Vision on State mortgage closings between approximately February 2008 and February 2009, and thereby knowingly facilitated the straw buyers' submission of false documentation in furtherance of the scheme. Those loans were closed with sales prices that had been artificially inflated to non-market prices in order to cover large,

undisclosed financial incentives (including down payments) to straw buyers, undisclosed commissions to Budzik's co-defendant recruiters, and amounts necessary to repay the project's bank financing. The scheme resulted in defaults on the mortgages and huge losses to the federally insured financial institutions, other mortgage lenders, and to the government sponsored enterprises, Fannie Mae and Freddie Mac.

On May 15, 2014, Budzik, along with his five co-defendants as part of a thirteen-count indictment, was charged with one count of bank fraud (18 U.S.C. § 1344). All six of the defendants charged in this scheme have pled guilty. Five of the six have been sentenced, with only Budzik's sentence remaining to be determined.

The government recommends a downward departure from the low end of the Advisory Guideline here because Budzik cooperated with the government during the investigation and provided substantial assistance. Indeed, he was the first of the three defendants who ultimately cooperated with the government investigation, and the first to plead guilty. Budzik met with government investigators and candidly and truthfully admitted what he had done. He also provided the government with useful information about others involved in the scheme. Budzik also provided information regarding one of his co-defendants' involvement in another fraud scheme, and he testified as a government witness in that case, helping the government to secure a conviction. Because of this cooperation, the government intends to make a 5K1.1 motion in defendant's favor at sentencing and has agreed to seek a sentence of 60 percent of the low end of the Advisory Guidelines. Such a sentence provides just punishment to defendant for his fraudulent conduct, promotes respect for the law, and deters others from engaging in mortgage fraud, while also rewarding defendant for his cooperation with the government.

## II. Factual Background

### A. Vision on State Scheme

At the beginning of the Great Recession in 2007, condominium units from a new real estate development project called Vision on State, in the South Loop of Chicago, were on the market. Vision on State was a project developed by 13th & State LLC, which was operated by co-defendants Warren Barr and James Carroll. Barr, Carroll, and others had planned for the unit sales to pay off the project's financing debts, and they and others had provided millions in personal guarantees to back the project's loans. However, the market at that time was not supporting sales of the units at the prices that Barr and Carroll needed them to in order to pay off the substantial financing incurred to build the project. By the spring of 2007, approximately 80 units remained for sale at Vision on State, and 13th & State LLC was having difficulty selling the units at prices that would allow it to cover its costs and repay its loans to creditors and investors. As a result, 13th & State LLC—through Barr and Carroll—began selling units to straw buyers at inflated non-market prices. Those straw buyers were recruited by co-defendants Leonardo Sanders, then later—after Sanders exited the scheme—co-defendant Asif Aslam.

In or around 2008, defendant Jeffrey Budzik—a licensed attorney at that time—was recruited into the scheme in order to represent the straw buyers at the fraudulent real estate closings. Budzik was recruited by co-defendant Robert Lattas, who was also a licensed attorney, and who acted as the seller's attorney, representing 13th & State LLC, at the fraudulent closings. Budzik attended numerous real estate closings on behalf of the straw buyers, but he rarely met them prior to the closings, had almost no interactions with them, and sometimes had difficulty communicating with them because of language barriers.

3

Budzik interacted with both Lattas and co-defendant Asif Aslam, who recruited straw buyers for the scheme, at closings and elsewhere. From those interactions and conversations, Budzik knew that the buyers were providing checks that falsely listed the buyers as the remitters of funds for down payments when, in fact, the buyers had obtained the money from Aslam. In addition, Budzik often knew that the true source of the down payment was being concealed from the lenders.

Budzik, Barr, Aslam, Lattas, and others knew that Aslam was being paid by 13th & State LLC to recruit buyers, and Budzik, Barr, Aslam, and others prepared a document that referred to Aslam's fees as payments for "investment expedition services." Budzik knew that some of the money received by 13th & State LLC from the closings was being returned to Aslam.

Although Lattas told Budzik that Aslam's fees did not have to be disclosed to the lenders, Budzik knew that settlement statements were supposed to truthfully and accurately list all of the money disbursed in connection with a real estate transaction. Budzik further knew that the fees being paid to Aslam were being concealed from the lenders. Budzik, Barr, Aslam, and others continued to conceal the payments to Aslam even after another attorney told them that a HUD-1 settlement statement must include all financial disclosures related to the sale of property.

On or about May 2, 2008, Budzik, Barr, Lattas, and Aslam caused fraudulent statements to be made to Wells Fargo Bank, N.A. when Buyer D obtained a loan to purchase a condominium unit at Vision on State. Specifically, Budzik attended a closing during which Buyer D purchased Unit 717 at 1255 S. State Street. Documents were signed related to the transaction. Budzik knew that the settlement statement fraudulently represented that a down payment of approximately $42,000 was being made by Buyer D when, in fact, the funds had been supplied by Aslam. Budzik

4

also knew that the settlement statement failed to list payments that were to be made to Aslam for recruiting Buyer D. Budzik knew that the deposits of Wells Fargo Bank, N.A. were insured by the Federal Deposit Insurance Corporation. Budzik further knew that true information about the sales price of units, the buyers' source of down payments, and the fees being paid to Aslam was material to the lenders' decisions to issue mortgage loans. Budzik has admitted that this was in violation of Title 18, United States Code, Section 1344.

Budzik, along with co-defendants Barr, Lattas, Aslam, Leonardo Sanders, and James Carroll, and others, caused buyers fraudulently to obtain approximately 45 mortgage loans to purchase condominium units at Vision on State, in a total amount of at least approximately $15,617,824. The lenders and their successors suffered losses of approximately $8,686,924, as follows: Bank of America ($2,976,015), CitiMortgage ($244,965), Countrywide Bank FSB ($156,300), Freddie Mac ($1,138,881), Guaranteed Rate, Inc. ($1,064,451), and Wells Fargo Bank ($3,106,312). Exhibit A (Vision on State loss charts of Budzik-related loans).

**B.     Stipulated Offense Conduct**

Beginning not later than June 2008, and continuing through approximately January 2009, Budzik, co-defendant Aslam, and others knowingly participated in a scheme to defraud a financial institution, namely, AmTrust Bank, Bank of America, CitiMortgage, HSBC, and Wells Fargo Bank, and others, and to obtain money and funds owned by and under the custody and control of a financial institution by means of materially false and fraudulent pretenses, representations, and promises.

Specifically, in or around June 2008, Budzik and Aslam met with individuals who were developing and selling units at a newly constructed condominium, Development A, in Chicago.

5

Similar to the market obstacles involved in the Vision on State scheme, Budzik and Aslam learned that the developers were having difficulty selling multiple units and paying off their construction loan.

Budzik knew that Aslam and the other individuals had agreed that Aslam would recruit buyers to purchase units from Development A at inflated prices. With Aslam's assistance, the buyers would then rent the units to others. In exchange, Development A agreed to pay Aslam substantial fees that Budzik, Aslam, and others knew would be used to make the buyers' down payments and to support a "guaranteed rent program" for the benefit of Aslam and the buyers.

Budzik served as the real estate attorney for the buyers recruited by Aslam. Budzik, Aslam, and others knew that the buyers were providing checks that falsely listed the buyers as the remitters of funds for down payments when, in fact, the funds had been obtained from Aslam. Budzik, Aslam, and others further knew that the true source of the down payment was being concealed from the lenders. In addition, Budzik, Aslam, and others knew that certain of the HUD-1 settlement statements failed to disclose the payments to Aslam, including a settlement statement submitted to CitiMortgage on or about August 28, 2008 that failed to disclose payments of approximately $125,000 that the developer was paying to Aslam for services that included recruiting Buyer OT to purchase Unit 902 at Development A. Budzik knew that the deposits of CitiMortgage were insured by the Federal Deposit Insurance Corporation and that true information about the payments to Aslam and the source of the buyers' down payments was material to CitiMortgage and other lenders.

Budzik, Aslam, and others caused buyers to fraudulently obtain approximately eleven mortgage loans with a value of approximately $4,800,000 to purchase condominium units at

6

Development A. The lenders suffered losses of approximately $2,035,863 as follows: Am Trust ($206,720), Wells Fargo ($621,654), HSBC Mortgage Corporation ($196,250), CitiMortgage ($204,000), and Bank of America ($807,239).

On or about August 28, 2008, Budzik, Aslam, and others knowingly executed and attempted to execute the scheme by causing CitiMortgage to fund a loan in the amount of approximately $304,000 for Buyer OT to purchase Unit 902 at Development A, in violation of Title 18, United States Code, Section 1344.

### III. The Advisory Sentencing Guidelines Range

The Government calculates defendant's advisory Sentencing Guidelines range as 63 to 78 months' imprisonment, which was also the estimated applicable range set forth in the Government's plea agreement with Budzik. Likewise, the Probation Officer calculates a base offense level of seven under Guideline § 2B1.1(a)(1), a twenty-level enhancement under Guideline § 2B1.1(b)(1)(K), because the loss exceeded $9,500,000, but is less than $25,000,000, and a two-level enhancement under Guideline § 2B1.1(b)(10)(C), because the offense involved sophisticated means. The Probation Officer also calculates a three-level reduction for acceptance of responsibility under Guidelines § 3El.l(a) and (b). Defendant has a criminal history category of I. Accordingly, this results in a 63 to 78 months' guidelines range, under offense level 26.

As further reflected in his plea agreement, defendant has provided cooperation to the government in connection with the investigation and prosecution of this case, as well as one other case. The government seeks a sentence of 60 percent of low end of that range, pursuant to Guideline §5K1.1, because of defendant's substantial assistance in the form of his provision of truthful information regarding the fraudulent scheme. Accordingly, the government considers a

7

downward departure to a sentence of 37.8 months' incarceration to be appropriate.

IV.     **Application of § 3553(a) Factors**

As part of the sentencing process, the Court is to consider the factors set forth in 18 U.S.C. § 3553(a), and impose a sentence that is sufficient, but not more than necessary, to achieve the goals of sentencing. The Section 3553(a) factors that appear most relevant in this case include: (1) the nature and circumstances of the offense; (2) defendant's history and characteristics; (3) the need to reflect the seriousness of the offense, to promote respect for the law, to afford adequate deterrence, and to provide just punishment for the offense; and (4) the need for restitution. Budzik's sentencing memorandum also invoked some of those factors, along with the need to avoid unwarranted sentence disparities and his lack of risk of re-offense, in seeking a sentence of one day, time served.  However, all of these factors weigh in favor of a 37.8-month sentence.

   A.    **The Nature of Defendant's Crimes Weigh in Favor of the Government's Recommended Downward Departure From a Guidelines Sentence**

Defendant's actions weigh in favor of a sentence within the advisory Guidelines range, adjusted downward pursuant to Guideline §5K1.1.  There are several aggravating factors specific to this offense that weigh toward imposing a sentence of incarceration.

The first aggravating factor is defendant's role in the offense.  In particular, defendant used his professional license as a member of the bar to further the scheme, putting a sheen of propriety on the closings that in fact were fraudulent.  Attorneys have ethical duties that promote the functioning of our legal system, including the lawful closing of financial transactions.  Budzik ignored those duties and thwarted that purpose in his participation in this scheme.

Second, defendant's crime caused harm to the system through which federally insured financial institutions lend money to legitimate individuals for legitimate purposes.  When money

8

is wasted on fraudulent mortgages, then that money is not available to fund legitimate home purchases, and the mortgage lending system loses credibility. Further, fraud schemes like this result in a bubble of foreclosures, depressing property values and causing instability in the market.

Lastly, defendant's criminal conduct was not a one-time lapse in judgment fueled by passion or anger. Instead, as the summary of the facts above show, his actions represented a repeated course of fraudulent conduct that was done in the belief that he would not be caught, and then he committed a nearly identical fraudulent scheme for different developers on another overleveraged real estate project.

All of the above weigh in favor of a 37.8-month sentence in this case.

### B. Defendant's History and Characteristics Further Weigh in Favor of the Government's Recommended Downward Departure from the Advisory Guidelines Range

The PSR sets forth information regarding defendant's history and characteristics, including aspects of defendant's employment, his childhood, and his family situation. Nothing in the PSR presents mitigating factors that explain why defendant chose to engage in prolonged fraudulent conduct. Indeed, the PSR shows Budzik was raised in a generally "good," two-parent home without any "neglect or abuse," although his father suffered from alcoholism.

However, the PSR and defendant's sentencing memorandum primarily focus on the events in Budzik's life since the conduct at issue in this case, noting the long time period since the fraudulent scheme. Both contain details about personal obstacles Budzik has faced in the intervening years, including being diagnosed with and overcoming cancer. They also convey proffered mitigation because his current wife and infant child rely on him as the primary breadwinner for the family, among other things.

9

The government has no reason to dispute any of those facts about defendant's life since the fraudulent scheme, and the Court certainly can, and should, weigh them in mitigation. However, these mitigating facts must be weighed against defendant's involvement in the serious nature of the crime at issue.

### C. The Sentence Sought Will Provide Adequate Deterrence to Others

A sentence of 37.8 months' incarceration will afford adequate deterrence to others, which is a critical consideration. This is the exact type of defendant and the exact type of crime where general deterrence matters. Mortgage fraud is a white-collar crime often committed by privileged defendants. As is often the case, this crime was not a crime of need or passion, but instead a crime of greed, opportunity, and convenience. Crimes of this nature can be deterred with punishment that includes lengthy terms of incarceration. Other would-be defendants who are thinking about committing mortgage fraud will think twice if they believe their actions will have serious consequences. These consequences cannot simply be disgorgement of ill-gotten gains or the payment of fines. Instead, the consequences must include serious sentences of incarceration to be effective.

In addition, mortgage fraud cases can be difficult to detect and prove, and lucrative to the participants. Thus, it is important that sentences in this and other fraud cases serve to deter individuals from committing the same crime. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

A sentence of 37.8 months in this case would deter others from committing fraud, promote

respect for the law, and would provide just punishment for defendant. Such a sentence would be a strong message to defendant and other would-be mortgage fraud defendants that their conduct is serious and will be punished accordingly.

**D.     The Sentence Sought Will Avoid Unwarranted Sentencing Disparities**

Defendant Budzik's memorandum argues that a sentence of one day, time served—like fellow defendant Asif Aslam—would avoid unwarranted sentencing disparities in this case, but that is not correct. Instead, Aslam's sentence was the disparate one, and it was not unwarranted, but instead based on a unique personal, family circumstance.

Defendant's memorandum includes a chart showing each defendant's government recommended sentence based on the plea agreement, along with the ultimate sentence. That chart reflects that each of the defendants other than Asif Aslam received sentences including years of incarceration. Of those four co-defendants, William Barr received the most significant sentence of 87 months' incarceration. The remaining three received a sentence that was exactly or nearly that set out as the anticipated government recommendation in their plea agreements. Defendant Leonardo Sanders' Advisory Guidelines sentence, as recommended by the government, would have been 33-41 months, and he received a 28-month sentence of incarceration. Defendant Robert Lattas' Advisory Guideline suggested a 63-to-78-month sentence, and he received a sentence of 63 months' incarceration. Defendant James Carroll was a cooperator like Budzik and also received cooperation credit—albeit less than Budzik, as Carroll received two-thirds of the low end of his 63-to-78-month Guideline—for a recommendation of 42 months. The court entered a 41-month sentence.

These sentences show a general consistency in the sentences, in which they hewed closely

11

to the plea agreement calculation. While defendant Budzik focuses on the one day, time served sentence for defendant Aslam, that sentence is the outlier here. As the sentencing hearing record and Aslam's sentencing memorandum reflect, Aslam had personal circumstances that are not present here. In particular, Aslam is the primary caretaker for his severely disabled child—a fact mentioned sympathetically by Judge Norgle in delivering Aslam's sentence.

Accordingly, that time served sentence considered Aslam's disabled child's need for his care, which is a unique personal circumstance and should not be the measuring stick for Budzik's sentence. Instead, the recommended sentence of 37.8 months, as a sixty percent downward departure from the Guideline sentence would promote consistency of sentencing in this case.[1]

E.  **Restitution**

Defendant should be ordered to pay $10,698,698 in restitution for both the Vision on State losses and the Stipulated Offense losses. The restitution should be made payable in the following amounts, to the following victims at the following addresses:

| Amount | Victim Name | Point of Contact | Address |
|---|---|---|---|
| $156,300 | Bank of America c/o Countrywide Bank FSB | ATTN: Donna McLauchlin Investigation Manager | 4161 Piedmont Parkway NC4-10502-11 Cash Remittance - Fraud Greensboro, NC 27410 |
| $3,783,254 | Bank of America | ATTN: Donna McLauchlin Investigation Manager | 4161 Piedmont Parkway NC4-10502-11 Cash Remittance - Fraud Greensboro, NC 27410 |
| $1,064,451 | Guaranteed Rate Inc. | Legal Department | 3940 N. Ravenswood Ave. Chicago, IL 60613 |
| $196,250 | HSBC Mortgage Corp | ATTN: Financial Crime Investigations | 452 Fifth Avenue New York, NY 10016 |

---

[1] Budzik's memorandum also included argument based on the Bureau of Prisons' early release of certain defendants. While that may be a possibility in any case, including for Budzik, the government does not consider that a relevant consideration for the imposition of the sentence itself.

| Amount | Victim Name | Point of Contact | Address |
|---|---|---|---|
| $448,965 | CitiMortgage, Inc. | ATTN: Legal Services Intake Unit | 701 E 60th Street North Mailstop 1251 Sioux Falls, SD 57117 |
| $1,138,881 | Freddie Mac | ATTN: Restitution Admin/Legal Division | 8200 Jones Branch Drive MS 202 McLean, VA 22102 |
| $3,727,966 | Wells Fargo Bank | ATTN: Restitution Admin/Legal Division | 1700 Lincoln Street, 9th Floor MAC C7300-09C Denver, CO 81203 |
| $182,631 | AmTrust Bank / New York Community Bank | ATTN: NYCB Legal Division | 102 Duffy Avenue Hicksville, NY 11801 |

## V.     Conclusion

For the reasons stated above, the government respectfully asks that the Court sentence defendant to 37.8 months' incarceration, which represents sixty percent of the low end of the applicable advisory Sentencing Guidelines range, to reflect defendant's substantial assistance to the prosecution.

                                                     Respectfully submitted,

                                                     JOHN R. LAUSCH, Jr.
                                                     United States Attorney

By:     /s/ Sarah J. North
         SARAH J. NORTH
         JASON A. YONAN
         Assistant U.S. Attorneys
         219 South Dearborn St., Rm. 500
         Chicago, Illinois 60604
         (312) 353-1413

Dated:   February 17, 2023